IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>　　　　　　　　　　　　　　　)<br>v.　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　)<br>MICHAEL BARRY CARTER,　　　)<br>　　　　　　　　　　　　　　　)<br>　　　　Defendant.　　　　　　　) | Case No. 8:20-cr-00151-PWG<br><br>The Honorable Paul W. Grimm<br><br>Sentencing hearing: December 9, 2020, 10:00 a.m. |

**DEFENDANT'S SENTENCING MEMORANDUM AND POSITION WITH RESPECT TO SENTENCING FACTORS**

Defendant Michael Barry Carter, by counsel, submits this memorandum to further assist the Court in determining a fair and just sentence in this matter.

On June 15, 2020, Mr. Carter was charged through an Information with one count of wire fraud under 18 US.C. § 1343 and one count of investment advisor fraud under 15 U.S.C. § 80b-6. On June 20, 2020, Mr. Carter appeared before the Honorable Paul W. Grimm in the United States District Court for Maryland and, pursuant to a plea agreement, pleaded guilty to both counts. The Court accepted Mr. Carter's plea and released him on unsecured bond. The Court continued the case for sentencing on November 9, 2020. Due to issues related to the ongoing COVID-19 pandemic, the Court rescheduled sentencing for December 9, 2020 at 10:00 a.m.

Nothing set forth herein is offered as an excuse for the actions that bring Mr. Carter before this Court. This memo is submitted solely to deepen this Court's understanding of Mr. Carter's personal struggles and the scope of his conduct that resulted in his convictions. For the reasons set forth below, Mr. Carter respectfully requests that the Court sentence him to 36 months of incarceration. For the reasons discussed below, such a sentence is more than sufficient to achieve a just result in this case.

1. **Corrections or Objections to the Presentence Report**

    A. **Corrections to Facts**

    Mr. Carter has no objections to the factual allegations in the Presentence Investigation Report ("PSR").

    B. **Objections to Sentencing Factors**

    Paragraph 32 of the Presentence Investigation Report recommends the Court impose a 2-level enhancement under the Sentencing Guidelines because Mr. Carter's "offense involved sophisticated means and the defendant engaged in or caused the conduct constituting sophisticated means." Dkt. 15, PSR ¶ 32 (citing USSG § 2B1.1(b)(10)(C)). A sophisticated means enhancement requires evidence showing "especially complex or especially intricate offense conduct, pertaining to the execution or concealment of an offense." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). Under the Sentencing Guidelines, sophisticated means constitutes, for example, "'[hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts,'" or similar conduct. *Id.*, *quoting* U.S.S.G. § 2B1.1 cmt. n. 9(B).

    The Fourth Circuit and other courts have repeatedly held that merely committing fraud or an offense involving deception, in and of itself, does not warrant an enhancement for sophisticated means: "sophistication requires more than the concealment or complexities inherent in fraud." *Adepoju*, 756 F.3d at 257. Rather, the Fourth Circuit and this District have found sophisticated means to include obtaining false identification to impersonate the victim, directing payment to fictitious companies, elaborately structuring compensation to avoid detection, using a network of confederates to carry out the offense, and using of multiple addresses.  The following cases contain examples of "sophisticated means":

- Employing several levels of fraud, including impersonating the victim to obtain a counterfeit driver's license and counterfeit university identification, and forging notices from the Internal Revenue Service directing the victim to pay a fictitious company. *United States v. White*, 850 F.3d 667, 676 (4th Cir. 2017).

- Drawing payments from an organization's operating, rather than payroll account to conceal compensation; disguising wages as allowances and reimbursements; and using an elaborate kickback scheme to disguise income. *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012).

- Transferring funds into bank account in the names of nominee companies he controlled. *Holliday v. United States*, Civil Action No. DKC-08-2341 (D. Md. Aug. 8, 2011).

- Using debit cards to fraudulently purchase postal money orders that were mailed to addresses to which the defendant had access or other addresses very near petitioner's home. *Mbenga v. United States*, Civil Action No. RDB-13-1424 (D. Md. May 22, 2015).

By contrast, Mr. Carter did not use sophisticated means to commit his offenses. Rather than use confederates, Mr. Carter acted alone. Rather than use shell corporations or fictitious business entities, Mr. Carter simply transferred the victims' funds into one of two accounts that bore his name. Dkt. 15, PSR ¶¶ 6, 8, 12. Rather than use a fictitious identity, Mr. Carter used his own email address to commit his offenses. Dkt. 15, PSR ¶ 12. Finally, when Morgan Stanley's verification process required a verbal verification through a phone call, rather than provide a false phone number or employ a confederate, Mr. Carter simply went to the victim's house and answered the phone himself. Dkt. 15, PSR ¶ 32. None of Mr. Carter's actions are of the nature warranting a sophisticated means enhancement.

Nor did Mr. Carter use sophisticated means to conceal his crimes. Mr. Carter sent his clients forged financial statements to disguise the unauthorized withdrawals, but a sophisticated means enhancement requires "more than the forgeries, misrepresentation, and concealment" normally associated with fraud. *Adepoju*, 756 F.3d at 257. The facts in this case do not establish that Mr. Carter's false financial statements were in any way sophisticated. *See* Dkt. 15, PSR ¶ 32.

Mr. Carter's offense went undetected for so long because he was in a position of trust and, in one instance, because his victim was elderly, not because it was sophisticated. Mr. Carter has already agreed that sentencing enhancements for these factors—holding a position of trust and involving a vulnerable victim—should be applied in calculating his applicable sentencing range. Dkt. 15, PSR ¶¶ 33-34. An additional enhancement for sophisticated means is therefore unnecessary and inappropriate.

**2. Position Regarding Sentence**

Under the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are now merely advisory. They are just one factor to be weighed by the Court in determining a just sentence. Under *Booker*, courts must now "tailor the sentence" by examining the factors outlined in 18 U.S.C. § 3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the guideline range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public from further crimes by the defendant, and to provide the defendant with needed correctional treatment. Based upon these factors, the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

**A. Familial and Personal Background**

Mr. Carter's friends and family were shocked when they learned that he had committed the offenses to which he pleaded guilty. "When I learned of the charges brought against him, I was in utter disbelief …. [I]t came as a surprise and a mystery to me. This is not how we were raised." Susan Carter Tropea Letter (Mr. Carter's sister), at 1. (All letters of support are attached

collectively as Exh. A.) Mr. Carter's parents stressed that their son is a good person who succumbed to weakness, rather than a person of bad character. Brooks and Carrol Carter Letter, at 1.

Mr. Carter grew up in a tight-knit, loving family. He was born on December 16, 1972 in New Orleans, Louisiana before his family moved to Maryland when Mr. Carter was four years old. Mr. Carter's parents were both long-time public employees. Before retiring, Mr. Carter's father, Alton Brooks Carter Jr., worked for the Federal Energy Regulatory Commission where he spent years implementing and maintaining FERC's electronic filing procedures. At 77, Mr. Carter still works part-time as a consultant for Science Applications International Corporation (SAIC). Mr. Carter's mother, Carroll Carter, worked as a librarian until she retired. Mr. Carter has two sisters, Susan Tropea, a part-time nurse in Kensington, Maryland, and Jennifer Carter, a mortgage consultant in Chicago, Illinois.

Mr. Carter grew up in a typical, happy, middle-class family. He was raised by his parents as part of a close, extended family. He regularly spent time with his aunts, uncles, and seventeen cousins. Michael's sister Susan described their family as follows:

> We were raised in a close, loving Catholic family and while my parents were strict, we always had love and everything that we needed. We did not have a lot of money and it was important to our parents that we learned to work hard for things we wanted. It was also important to them that we were good people, put family first and that whatever career we chose, we were happy.

Susan Carter Tropea letter, at 1. Michael enjoyed spending time with and supporting all his family members:

> Michael was the oldest boy in our large extended family with seventeen first cousins. Michael has always been a great caretaker and entertainer for all of us, and I'm especially grateful for how wonderfully inclusive he's always been to me. Even though I am nine years younger, whether I was an elementary schooler, or a college kid, Michael always made himself available to spend time with me, and let me into whatever he was doing when we both lived in Atlanta and DC.

Anne MacDonald Letter, at 1.

Mr. Carter attended Quince Orchard High School in Gaithersburg, Maryland, where he was an active student and athlete. He played lacrosse for four years and, due to his dedication to the team and leadership ability, his teammates selected him team captain his senior year.

Mr. Carter's upbringing instilled in him a love for family that he has carried over to adulthood. He has been a caring and devoted husband and father. Mr. Carter's sister confirmed that Mr. Carter "has always put family first and is always there for us in time of need." Susan Carter Tropea Letter, at 1. Mr. Carter dated the mother of his children, Bonnie, briefly in high school, but they lost touch when they went to separate colleges. In 2003, when he returned to the D.C. area after living in Atlanta, Mr. Carter was out with his sister when they saw Bonnie. Mr. Carter's sister thought Mr. Carter and Bonnie would make a good couple, so she arranged a date between the two. Mr. Carter's sister was correct. Mr. Carter and Bonnie married two years later in 2005. They remained happily married for over 15 years until recently when Bonnie obtained a divorce due to Mr. Carter's offense. Mr. Carter still loves Bonnie and believes that they would still be married but for his conduct.

Mr. Carter is a loving father to his three, children, 13-year-old ▮, 11-year-old ▮, and 9-year-old ▮. All three children "are terrific, intelligent kids who are doing extremely well in school and remain active in extra-curricular activities." Brooks and Carroll Carter Letter, at 1. ▮ and ▮ play several sports and ▮ enjoys dance and music. Mr. Carter was deeply involved in all his children's activities. He "spent many evenings and weekends coaching them in lacrosse, attending dance recitals for ▮, and lacrosse, basketball and flag football games for ▮ and ▮." *Id.* at 1-2. Mr. Carter's sister also saw that "[n]o matter how busy he was, he

6

always found time to coach his son's lacrosse team, attend his daughter's dance recitals and throw the football with his youngest son." Susan Carter Tropea Letter, at 1.

Michael's cousin, Anne MacDonald, confirmed Mr. Carter's devotion to his family:

> Michael grew into a phenomenal dad, who has tremendous pride in and love for his three children: ▮, 13; ▮, 10, and ▮, 8. … This year, I've been heartened to see how Michael has continued to find creative ways to care for and support his kids in different ways. On a recent birthday for ▮ - a terrific athlete - Michael figured out how to make him new lacrosse stick heads with at-home materials, creating stickers with ▮'s favorite emblems that somehow involved boiling them onto the plastic.

Anne MacDonald Letter, at 1. Ms. MacDonald believes Mr. Carter's offense was a misguided attempt to improve his family's life: "I might speculate that much of Michael's theft was fueled by a desire to dramatically provide for them." *Id.*

Mr. Carter's actions, both the good as well as the bad that bring him before this Court, have always been driven by a powerful devotion to his family. As his sister explains:

> When I think of my brother, I think of a kind and compassionate husband, father, brother, son and friend. He has done an amazing job raising his three kids and making sure they are loved and that they know right from wrong. He has always put his family first and is always there for us in time of need... [Michael's children] admire their dad so much, as I can see when they look at him. Not having their dad around is going to be the hardest thing they ever experience, as it will be for Michael.

Susan Carter Tropea Letter, at 1.

No legally imposed punishment can hurt Mr. Carter worse than the loss of his wife and the time he will lose helping his children grow up. As Bonnie's letter to the Court painstakingly explains:

> [Michael] was an incredibly involved father.... He is not only expecting to pay for his actions, but believes he is entirely deserving of the consequences. He has never once made an excuse to me for his actions, nor tried to justify them in any way.
>
> My children are 13, 11 and 9. They have only known him as an engaging, loving, fun, dedicated and understanding father. They knew him as a father who created mini leagues for them during football season, nicknames at bedtimes, and special

7

> stories unique to only them. The impact to them has been immeasurable.... We have both been very honest with them that he must pay for what he has done, and as much as they can, they understand this. I think of the ways they will grow up without him, and I worry so much for all involved.
>
> My children are old enough to feel each day of his absence. His involvement in their future is dependent on evidence of change. Given their ages, regular visitation will be hard for them. I am asking on their behalf, for you to consider the preservation of that very important father child relationship when determining sentencing.

Bonnie Carter Letter at 1-2.

Mr. Carter has always contributed to his community by donating his time and energy to different charities. His sister noted that "Michael has done so many things to help others." Susan Carter Tropea Letter, at 1. During high school, Mr. Carter and two friends decided to do something for senior citizens in their community. They organized a social event called The Senior Prom. The Senior Prom brought local senior citizens together with their family, friends, and students for a dance honoring the senior citizens.

More recently, Mr. Carter volunteered his time for Habitat for Humanity, which helps low-income families become homeowners. He also volunteered for the Tin Cup Fund which supports people transitioning from homelessness. *See* Susan Carter Tropea Letter, at 1. Similarly, Mr. Carter and his wife hosted several events for Comfort Cases, a company that creates backpacks containing necessities, such as pajamas and a toothbrush, for children entering foster care. *Id.*

### B. Education and Work History

When Mr. Carter was accepted by the University of Delaware, he looked forward to earning his degree. The summer before Mr. Carter left for college, however, a close friend committed suicide. Then, during his freshman year, another close friend was killed in a car accident. In trying to address these two tragedies, Mr. Carter lost focus on school and his grades suffered badly. Mr. Carter realized he was not yet ready to take his education seriously. After his freshman year, Mr.

Carter returned home for a year and worked to save money. He returned to school, continued to work and take classes, but he never recovered from his poor start and did not obtain a degree.

Once Mr. Carter accepted that he would not complete his degree, he moved to Atlanta to avail himself of the opportunities provided by Atlanta's hosting of the 1996 Summer Olympics. While in Atlanta, Morgan Stanley accepted Mr. Carter into its broker training program. Mr. Carter worked hard for Morgan Stanley but struggled to produce the results demanded by the firm.

Despite his initial struggles, Mr. Carter enjoyed being a financial advisor and was determined to make a career of it. Mr. Carter returned to the Washington D.C. area and worked as a broker's assistant at a smaller brokerage firm for a short period of time before moving to Merrill Lynch. In 2005, Mr. Carter returned to work at Morgan Stanley as a financial advisor.

After his offenses were discovered by Morgan Stanley, Mr. Carter continued to work to provide for his family and to try to reimburse his victims. The Carters sold their family home. Bonnie took her share of the equity to provide a new home for her and the children. Mr. Carter used his share to pay spousal support, rent, and other expenses for Bonnie, to pay some restitution, and to partially repay his parents for their exceptional financial support during this difficult time.

Mr. Carter also found work as a sales representative for Home Depot selling windows and doors. He worked tirelessly and excelled at the position:

> In late September 2019, Michael got a job with Home Depot selling windows and doors to cover his expenses and provide some financial support for his wife and children. Michael spent a few weeks learning the job requirements, but once he started making sales calls, be became the first or second ranked sales rep in the East Tennessee region each month. He worked solely on commission and received no travel or meal reimbursement for days that involved a hundred to three hundred miles of travel. Even some customers who elected to go with a lower-priced company complimented him on his knowledge and the quality of his presentation.

Brooks and Carroll Carter Letter, at 1. Mr. Carter made sure to treat his customers fairly. His father explained that Mr. Carter "never exerted pressure, even telling some customers they only needed

repair (and he recommended companies for such repairs) instead of replacement." *Id.* Mr. Carter's sister also saw his efforts to be fair to his customers:

> Over the last year, Michael has worked for Home Depot in Tennessee. He drove all around the state selling doors and windows during the pandemic. He had great relationships with his clients and would do anything for them. When he was let go, after pleading guilty, he still followed up with his clients to make sure everything was okay. This was out of the kindness of his heart, as he was no longer being paid.

Susan Tropea Carter Letter, at 1. Mr. Carter continued to work until the Court ordered Mr. Carter to disclose his pending case to his employer, after which he was let go, a decision which his supervisor attempted to reverse:

> To say that I was shocked to learn of Michael's plea to charges, and his subsequent termination, would be an understatement. The person I had come to know was a terrific father, diligent worker, and very caring person. Michael did not have to discuss the nature of his offenses with me per company policy, but he was straightforward, remorseful, and accepts full responsibility for his actions. I respected the person and job he was doing so much that I worked hard trying to overturn the company's decision to let him go – and I had several Store Managers and Supervisors working with me on his behalf because they felt the same way about Michael.

Marshall Ridley Letter, at 1.

### C. Nature and Circumstances of the Offense

Mr. Carter fully accepts responsibility for his wrongdoing and is prepared to accept the consequences of his actions. Like many persons accused of embezzlement or similar crimes, Mr. Carter initially used his clients' money to get himself out of a financial predicament. As explained above, Mr. Carter's parents instilled in him a strong regard for family. Mr. Carter's first marriage had failed, and he was determined to build a strong family with Bonnie. In 2007, when his offenses began, he was trying to start that family:

> This horrible situation began in 2007. I was married and my wife had just given premature birth to our daughter. I had less than $1,000 in the bank. We were living in a townhouse with an adjustable rate first mortgage that I was struggling to pay, a second mortgage, and heavy credit card debt. My wife was working as a public-

> school counselor, but her earnings were only going to cover the cost of childcare. I was working with Morgan Stanley, but not earning much money. My compensation was commission based, and I did not have many clients.

Dkt. 15, PSR ¶ 20. Also, like many others who commit similar offenses, Mr. Carter intended to pay back his victims, but the effect snowballed, and he lost control:

> Faced with these pressures, I made the terrible decision to take money from an account I managed for my wife's grandparents, the ▓▓▓▓'s.... I told myself I would pay the money back within a year, but my income would not allow it. Instead, I compounded my mistakes and took more money on several occasions. Over a five-year period, I came to realize that I had taken approximately $1 million.... [T]he funds supported a lifestyle that I could not afford, and did not deserve…. I became addicted to fitting in with our wealthy friends and family….

> My decision to embezzle funds was beyond control. I felt very trapped in the vicious lie I had created. I knew what I was doing was awful, and to family and friends no less. I could not bring myself to tell the truth. My wife and family had no idea their lives were built on my crimes.... I often contemplated suicide.  I bought a $5 million life insurance policy with a suicide exemption that expired after the first two years.  I was determined that would be my way out, especially during the weeks following the discovery of my crimes.

*Id.* at ¶ 21.

> Mr. Carter understands that his family pressures do not excuse his actions in any way:

>  My wife has left me and I rarely get to see my children.  I understand that is a consequence I must bear.

> There is no excuse for my conduct, and I deserve everything that is happening now. I do not blame anyone but myself. I am profoundly sorry to the victims, my family, and friends.  I am embarrassed and deeply ashamed for the pain I have caused them. I fully expect a period incarceration.  I understand it is part of the debt I must pay to atone for what I have done.

Dkt. 15, PSR ¶ 25.

### D.  The Guideline Range

The Federal Sentencing Guidelines provide a base level 7 for the offense. USSG §2B1.1(a)(1), with an 18 point enhancement because the actual or intended loss amount was more than $3,500,000 but not more than $9,500,000. USSG §2B1.1(b)(1)(J).

11

As part of his plea agreement, Mr. Carter agreed to certain enhancements under the sentencing guidelines. Mr. Carter agreed to a 4-level enhancement because his conduct violated federal securities laws when Mr. Carter was a registered broker or dealer, or a person associated with a broker or dealer or an investment adviser. U.S.S.G. § 2B1.1(b)(20)(A). Mr. Carter also agreed that a 2-level enhancement applies because one of his victims was elderly and, thus, vulnerable. USSG §3A1.1(b)(1).

The government agreed that Mr. Carter is entitled to a 2-level decrease for clearly accepting responsibility for his actions, and a further 1-level decrease for assisting authorities with their investigation by timely notifying the government that he intended to plead guilty. USSG §3E1.1(a), (b). But Mr. Carter should not receive, as the government requests, a 2-level enhancement for using sophisticated means. As described above, Mr. Carter's means of committing and concealing his offense were not "sophisticated" as that term is employed under the Guidelines.

The government argues that the sentence should be based upon a total offense level of 30 and a criminal history category of I, for which the recommended imprisonment range is 97 months to 121 months. Mr. Carter argues that the correct total offense level is 28. With a criminal history category of I, the imprisonment range is 78 months to 97 months.

Regardless of the ultimate Guidelines recommendation adopted, Mr. Carter submits that the other factors set forth in 18 U.S.C. § 3553(a) greatly outweigh this one factor and that a sentence well below the Guideline's recommended sentencing range is appropriate.

### E.  The Need to Avoid Sentencing Disparities

Mr. Carter committed his offenses by himself so there is no need to avoid sentencing disparities among co-defendants. To provide the Court with guidance on this factor, Mr. Carter's counsel reviewed this District's past case docket for examples of similarly situated defendants and

12

the sentences they received. In *United States v. Chapman*, Case No. 1:03-cr-301 (D.Md. Nov. 4, 2004), the defendant was convicted by a jury of several counts of wire fraud, mail fraud, and aiding and abetting investment advisory fraud. In *Chapman*, the defendant, refused to plead guilty and retained private counsel to take his case to trial. After being found guilty, he received a sentence of 63 months and was ordered to pay $5,000,856 in restitution. It would be inequitable to impose a harsher sentence on Mr. Carter than that imposed in *Chapman* on a defendant who refused to accept responsibility for crimes that resulted in a larger loss to victims than this case.

In *United States v. Elgawhary*, Criminal No. DKC 14-CR-0068 (D.Md. March 23, 2015), the defendant pleaded guilty to mail fraud, conspiracy to lauder money, and interference with internal revenue laws. The defendant's fraudulent scheme involved his receipt of illegal payments which defrauded his employer and corrupted a competitive bidding process. The defendant's scheme resulted in an illegal profit to him of at least $5,258,995 (the amount ordered in forfeiture and restitution), yet the government, pursuant to its plea agreement, recommended a sentence of 42 months which the Court accepted.

In *United States v. Smith*, Criminal No. PWG-13-CR-0322 (D.Md. July 3, 2014), defendant Vernon Smith was indicted for conspiracy to defraud the United States, several counts of wire fraud, and several counts of tax fraud pertaining to his receipt of at least $6,194,828 in income illegally obtained from the Small Business Administration. The defendant pleaded guilty to conspiracy to defraud and was sentenced to 42 months of imprisonment.

Based on the foregoing, Mr. Carter's request for a sentence of 36 months is consistent with similarly situated defendants and would not result in an improper sentencing disparity.

    **F. The Need for Restitution**

Mr. Carter has agreed to the entry of a restitution order for the full amount of the victims' losses, which the parties agree is $4,355,110.39. As he noted in his Presentence Report statement,

13

Mr. Carter is grateful that Morgan Stanley has fully compensated the victims for their losses, and he is committed to do everything he can to reimburse Morgan Stanley for its losses.

> He is fully repentant and wants to work towards paying back what he stole as soon as he can, and demonstrated his desire to work hard to achieve that goal through his job at Home Depot he held most of the last year.

Anne MacDonald Letter, at 1.

It must also be noted that, prior to being contacted by any law enforcement agencies, Mr. Carter made full restitution to the ▮▮▮▮▮▮▮▮▮▮ in the amount of $79,375.91.  *See* Exh. B.  The Lacrosse Club was the one victim in this case that was not a client of Morgan Stanley. The restitution paid constituted almost all the discretionary assets available to Mr. Carter.  While Mr. Carter realizes this sum is only a fraction of the total he owes, it is still a substantial amount that weighs in favor of a mitigated sentence.

### G. The need for the sentence to reflect the seriousness of the offense, to afford adequate deterrence, to protect the public from further crimes by the defendant, and to provide the defendant with needed correctional treatment.

Mr. Carter understands the seriousness of his offense and that he must serve some time in prison. An extended sentence such as recommended by the Sentencing Guidelines, however, is not necessary to protect the public against any further crimes. Mr. Carter has lost or will lose all of his professional licenses.  He has already voluntarily entered into an agreement with FINRA banning him from participating in any future investment advising or banking activities. *See* Exh. C. Through counsel, similar agreement with the Securities and Exchange Commission and the Maryland Securities Commission are currently being negotiated.  Mr. Carter will never work as an investment advisor again.

Nor is an extended sentence necessary to prevent Mr. Carter from committing further crimes. Mr. Carter's sister observed first-hand the toll this case has taken on Mr. Carter:

> This is something that he will have to live with for the rest of his life. It has cost him his family, his friends, his integrity and his self-worth. Those are just about the worst things that you can take from a person. That is why I believe that when he is released, he will never commit another crime again.

Susan Tropea Carter Letter, at 2.

Shortly after Mr. Carter confessed to his offense, his wife filed for divorce and moved to Ashburn, Virginia, with Mr. Carter's three children. Mr. Carter is staying with his parents in Knoxville, Tennessee, while awaiting sentencing which means he cannot see his children regularly. Mr. Carter's parents have seen the pain the separation from his children has inflicted on Mr. Carter:

> One of the most painful parts of this ordeal is the physical distance between Michael and his children, which prevents him from seeing ▓▓▓▓'s recitals or games for ▓▓▓▓ and ▓▓▓▓. He speaks to them one or more times each week and the love they have for him is obvious. On August 29, he drove to Staunton, VA to meet his wife and bring the children to Knoxville for a visit. ... He took them home four days later and returned to Knoxville the same day. It was an emotional departure when he left Ashburn, VA.

Brooks and Carroll Carter Letter, at 1. Mr. Carter has also lost any support network beyond his parents and siblings: "As a result of his transgressions, Michael no longer has contact with his wife's parents and grandparents and his friends from Northern Virginia have abandoned him." Brooks and Carroll Carter Letter, at 2.

As the attached letters passionately describe, Mr. Carter deeply cares about his family, his friends, and his community. As soon as he was confronted by Morgan Stanly investigators, Mr. Carter confessed to his crimes, took full responsibility for his conduct, and began taking meaningful steps to account for his wrongdoing. He is a man with no prior criminal history who has openly admitted his wrongdoing to his family, employers, and friends, a painful and embarrassing process, but one that Mr. Carter understands is a necessary part of acceptance and rehabilitation. Mr. Carter has already lost everything he cares most about: his wife, his children,

and his reputation. He is determined to pay his debt for his crimes, return to his family, and continuing living a life that positively impacts others. Although he understands he must be punished, an extended prison sentence of the length recommended by the Guidelines is inappropriate and unnecessary to achieve the goals of sentencing.

## Conclusion

Based on the foregoing, and any additional evidence and argument as may be presented in open court, Mr. Carter submits that 36 months of incarceration is sufficient and not longer than necessary to satisfy the sentencing factors identified in 18 U.S.C. § 3553(a).

Dated: November 9, 2020                     Respectfully Submitted,

*/s/Ari S. Casper*
Ari S. Casper
The Casper Firm, LLC
400 East Pratt St., Suite 903
Baltimore, MD 21202
Tel: 410-989-5097
Fax: 410-630-7776
acasper@casperfirm.com

*/s/James W. Hundley*
James W. Hundley, VSB # 30723
BRIGLIA HUNDLEY, P.C.
1921 Gallows Road, Suite 750
Tysons Corner, Virginia 22182
703-883-0880
703-883-0899 (fax)
jhundley@brigliahundley.com
Admitted *pro hac vice*

*Counsel for Michael Barry Carter*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of November, 2020, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will send notice of said filing (NEF) to all counsel of record in this case.

/s/*James W. Hundley*  
James W. Hundley